915 F.2d 1383
 Maurice S. THOMPSON; Charles A. Green; John Gzikowski;
Keith D. Williams; Ronald E. Lanphear; Chol Soo Lee;
Andrew E. Robertson, individually and on behalf of all
others similarly situated, Plaintiffs-Appellees,
v.
Jiro J. ENOMOTO (former Director, California Department of
Corrections; current Director James Rowland); George
Sumner, Warden (former Warden, San Quentin State Prison;
current Warden Daniel Vasquez), Defendants-Appellants.
Maurice S. THOMPSON; Charles A. Green; John Gzikowski;
Keith D. Williams; Ronald E. Lanphear; Chol Soo Lee;
Andrew E. Robertson, individually and on behalf of all
others similarly situated, Plaintiffs-Appellants,
v.
Jiro J. ENOMOTO (former Director, California Department of
Corrections; current Director James Rowland); George
Sumner, Warden (former Warden, San Quentin State Prison;
current Warden Daniel Vasquez), Defendants-Appellees.
 Nos. 89-16335, 89-16420.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 16, 1990.
Decided Oct. 4, 1990.
 
 Jeffrey D. Wohl, Orrick, Herrington & Sutcliffe, San Francisco, Cal., Donald Specter, Laura B. Prado, Prison Law Office, San Quentin, Cal., for plaintiffs-appellees-cross-appellants.
 John G. Donhoff, Jr., Deputy Atty. Gen., San Francisco, Cal., for defendants-appellants-cross-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before HUG, SKOPIL and SCHROEDER, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 California state prison officials appeal the district court's order modifying a 1980 consent decree between prison officials and a class of individually named inmates sentenced to death by the State of California and housed at San Quentin Prison. The inmates cross-appeal, opposing a particular section of the court's modification of the decree. We affirm.
 
 I.
 FACTS AND PROCEDURAL BACKGROUND
 
 2
 Maurice Thompson and other inmates sentenced to death ("Inmates") in the California State Prison at San Quentin commenced this civil rights action on July 6, 1979, against prison officials of San Quentin, alleging that the conditions under which the Inmates are housed at San Quentin constituted cruel and unusual punishment and a denial of due process under the federal and state Constitutions.
 
 
 3
 On October 23, 1980, the Inmates and prison officials at San Quentin entered into a consent decree. The decree required prison officials to take a number of corrective actions, including modifications in housing, treatment, and privileges of the Inmates. These modifications were to be implemented within a one-year period.[1]
 
 
 4
 When the decree was entered, all the Inmates were housed on Condemned Row I in the North Segregation Unit ("North Seg"). The increase in the population of prisoners sentenced to death and renovations in North Seg necessitated the housing of the Inmates in non-North Seg areas.[2] While in non-North Seg areas, the Inmates lost certain rights and privileges afforded under the decree. Consequently, the Inmates asked the court to extend jurisdiction for six months and to hold the prison officials in contempt for not abiding by the decree.
 
 
 5
 In January of 1982, the court granted the Inmates' motion to extend its jurisdiction for six months, to give the prison officials time to satisfy the provisions of the decree. The court further held that if the prison officials substantially complied with the decree before the expiration of the six months, that no further extension of jurisdiction would be granted.
 
 
 6
 In June 1982, the prison officials had yet to satisfy the decree's provisions. The court, however, declined to grant the Inmates' motion to hold prison officials in contempt, finding that prison officials had been reasonably diligent in attempting to comply and that substantial physical and security differences between North Seg and non-North Seg areas, to which the Inmates had been moved, made it impossible for prison officials to comply with the decree. Thompson v. Enomoto, 542 F.Supp. 768, 770 (N.D.Cal.1982). Accordingly, the court held that modification of the decree was necessary, and directed the parties to negotiate to modify the decree. Id. The court also directed the parties to appear before the court upon completion of negotiations, for the court's approval of the proposed modifications. Id.
 
 
 7
 The parties failed to reach an agreement regarding modifications. The Inmates, frustrated by continuing noncompliance, filed a motion in the district court on January 11, 1985, requesting appointment of a special master pursuant to Fed.R.Civ.P. 53, to assure compliance with the decree.[3]
 
 
 8
 The decree established procedures for the resolution of any disputes regarding compliance:
 
 
 9
 [I]n the event of a dispute, ... with respect to whether terms of the decree have been reasonably complied with, any party may present such dispute to this court which will then establish procedures for the resolution of such dispute and may thereafter issue such orders as it deems necessary to assure compliance.
 
 
 10
 Accordingly, the court granted the Inmates' motion and, on March 25, 1985, entered an order appointing Robert R. Riggs as "Monitor." Accompanying this order, the court filed an Order of Reference, detailing the Monitor's responsibilities, authority, and compensation.[4] The order provided:IT IS FURTHER HEREBY ORDERED that any report of the Monitor shall be adopted as the findings of fact and conclusions of law of the Court unless, within ten days after being served with notice of the filing of the report, either side moves to reject or modify the report. The Court will entertain no objection to any report unless it is shown as a preliminary matter that an identical objection was submitted to the Monitor in the form of a specific written objection in accordance with the preceding paragraph of this Order. In accordance with Federal Rule of Civil Procedure 53(e)(2), the Court shall accept the Monitor's findings of fact unless clearly erroneous.
 
 
 11
 Order of Reference at 3-4.
 
 
 12
 The prison officials appealed the court's appointment of a Monitor. In our decision on appeal, we noted that the decree implicitly contemplates appointment of a special master by retaining authority to establish procedures for its compliance, and held that the order appointing a Monitor to supervise compliance with the decree was not an appealable interlocutory order. Thompson v. Enomoto, 815 F.2d 1323, 1327 (9th Cir.1987). We explained in our decision that the Monitor's recommendations could be "effectively reviewed when the district court decide[d] whether to adopt the Monitor's recommendations." Id.
 
 Monitor's First Report
 
 13
 On October 31, 1985, the Monitor filed his first report. The first report found that the prison officials were not in compliance with the decree in several respects. Nonetheless, the Monitor declined to recommend that the prison officials be held in contempt because he construed the decree to be limited in application only to those Inmates confined in North Seg.
 
 
 14
 The Inmates moved the district court to reject the latter aspect of the Monitor's First Report, which limited confinement of the decree to North Seg. The prison officials failed to submit written opposition to the first report or the Inmates' motion.
 
 
 15
 On December 18, 1986, the district court entered an order granting the Inmates' motion and directing that the decree should be construed as applying to all the prisoners sentenced to death at San Quentin wherever housed.
 
 
 16
 Prison officials filed a motion for reconsideration, which was denied on January 29, 1987. The court based its denial not only on the language of the decree, but also on the prison officials' post-decree conduct and on its previous orders.
 
 
 17
 The prison officials did not appeal the court's denial of the motion for reconsideration or the order adopting the Monitor's report. Under our circuit court decision, this was the appropriate time to appeal.
 
 Monitor's Second Report
 
 18
 In early 1987, prison officials moved the Monitor to modify the decree to allow them greater latitude to handcuff the Inmates during movement off the tier. On July 27, 1987, the Monitor denied the prison officials' motion in his second report. The Monitor also noted that the question of the prison officials' compliance with the decree as to the Inmates, other than those housed in North Seg, would be discussed further in the next report.
 
 
 19
 Shortly thereafter, the parties requested that the Monitor suspend further investigation so that they could again attempt to modify the decree by agreement. On March 10, 1988, the parties stipulated to a modification of the decree, by which prison officials agreed to provide free weights for outside exercising and the Inmates agreed to afford prison officials latitude to restrain them during movement off the tier.
 
 
 20
 The Inmates also agreed at this time to seek dismissal of a separate state court action by an individual inmate challenging prison officials' policies regarding access to electronic memory typewriters. In exchange, prison officials agreed to allow electronic typewriters with up to 4K random access built-in internal memory. In the stipulation relating to the separate state court action, the Inmates specifically reserved the right to challenge any of the prison officials' policies regarding inmate access to typewriters.
 
 
 21
 The district court approved the modification of the decree on March 17, 1988.
 
 
 22
 In May of 1988, the Inmates requested that the Monitor resume his investigation of the status of the prison officials' compliance with the decree because negotiations between the parties had again proved unproductive.
 
 Monitor's Third Report
 
 23
 In November, 1988, the Monitor issued his third report, recommending that the district court order prison officials to show cause why they should not be held in contempt for numerous instances of noncompliance with the decree.
 
 
 24
 At the time the third report was issued, all the Inmates had been transferred to the East Block at San Quentin, a separate structure in which the Inmates had not been confined previously. In his third report, the Monitor noted that the Inmates were "a class within the meaning of Rule 23 of the Federal Rules of Civil Procedure, consisting of all prisoners housed under sentence of death at San Quentin State Prison, wherever housed within that prison."
 
 
 25
 Prison officials did not file any objections to the Monitor's Third Report with the district court, and on December 15, 1988, the third report was adopted by the district court. Again, prison officials did not appeal.
 
 Monitor's Fourth Report
 
 26
 Subsequently, prison officials filed a motion with the Monitor to vacate the decree on the grounds that the object of the decree had been fulfilled by "operation of law" because the Inmates' current conditions of confinement, while not in conformity with the decree, were nevertheless not in violation of the Constitution. In the alternative, prison officials moved to modify the decree to conform with the manner in which they were presently confining the Inmates.
 
 
 27
 After consideration of the prison officials' motions, seven days of hearings and extensive post-hearing briefing, the Monitor issued his fourth report on August 1, 1989. In his fourth report, the Monitor denied the prison officials' motions. However, he recommended that the decree be modified in various respects for application to the Inmates confined in the East Block. He also recommended that the decree be modified to withdraw certain equipment and privileges from that segment of the Inmate class known as "Grade B condemned inmates."[5] Except as so modified, the Monitor determined that the prison officials' failure to comply with the decree was not justified, and he recommended that prison officials be ordered to comply or to be held in contempt. Pursuant to the Order of Reference, the Monitor's Fourth Report was submitted to the district court for adoption.
 
 
 28
 Prison officials moved the court to reject the Monitor's report and vacate or amend the decree. The Inmates sought to have the district court adopt the fourth report, except for modifications regarding Grade B condemned inmates.
 
 
 29
 On October 5, 1989, the district court entered its order adopting the Monitor's Fourth Report as submitted. On October 26, 1989, prison officials appealed. On November 7, 1989, the Inmates filed a cross-appeal with respect to the Grade B condemned inmate issues.[6] It is this appeal and cross-appeal of the order adopting the Monitor's Fourth Report that is before us for review.
 
 II.
 CONSENT DECREES
 
 30
 Consent decrees have the attributes of both contracts and judicial acts. Washington v. Penwell, 700 F.2d 570, 573 (9th Cir.1983). In construing consent decrees, courts use contract principles. Id. The contract law of the situs state applies. Id. (citing Collins v. Thompson, 679 F.2d 168, 170 (9th Cir.1982)). In California, a contract is to be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal.Civ.Code Sec. 1636. Interpretation begins with the contract's language which "is to govern ... if the language is clear and explicit." Id. Sec. 1638. Interpretation of a consent decree is a question of law reviewed de novo. Keith v. Volpe, 784 F.2d 1457, 1461 (9th Cir.1986).
 
 
 31
 A district court has the power to modify a consent decree if experience with the administration of the decree shows the need for modification in order to accomplish the primary goals of the decree. Keith, 784 F.2d at 1460. The court's decision to modify a consent decree is reviewed for abuse of discretion. Washington, 700 F.2d at 575.
 
 III.
 PRISON OFFICIALS' ARGUMENTS ON APPEAL
 
 32
 On appeal prison officials argue that: (1) the district court lacked jurisdiction to modify the decree after 1982; (2) the district court exceeded its jurisdiction in enforcing the consent decree outside of North Seg; and (3) the district court abused its discretion in denying prison officials' motion to vacate the decree on Eleventh Amendment grounds.
 
 A. Jurisdiction to Modify
 
 33
 The prison officials argue that the district court lost its jurisdiction to modify the decree after the expiration of the district court's 1982 six-month extension of jurisdiction. We disagree.
 
 
 34
 It is clear that the district court had jurisdiction of the civil rights action brought by the Inmates, alleging that the conditions of the prison constituted cruel and unusual punishment and a denial of due process. The Inmates and the prison officials then entered into a consent decree on October 23, 1980 in settlement of the litigation. The terms of that decree provided:
 
 
 35
 The Court shall retain jurisdiction for one year. During that year the provisions of this decree shall be implemented.
 
 
 36
 ....
 
 
 37
 At the end of one year from the date of this decree, by which time the terms of this decree shall have been implemented, this action shall be dismissed in its entirety. Provided, however, in the event of a dispute, during the one year from the date of this decree, with respect to whether the terms of this decree have been reasonably complied with, any party may present such dispute to this Court which will then establish procedures for the resolution of such dispute and may thereafter issue such orders as it deems necessary to assure compliance.
 
 
 38
 There had not been full implementation of the decree by the end of the year. The plaintiffs moved to extend jurisdiction for six months, and the defendants moved for a determination of the provisions of the decree and for modification. This resulted in the order of January 20, 1982. The decree was modified and jurisdiction was extended for six months. The order provided in pertinent part:
 
 
 39
 IT IS HEREBY ORDERED that jurisdiction of the Court continue for six months from the date of this order so that the parties may satisfy the Court that the provisions of the Consent Decree have been fulfilled. If it appears at or before the expiration of said six months that there has been substantial compliance with the letter and the clear intendments of the Consent Decree, the Court intends that there shall thereafter be no further extension of jurisdiction.
 
 
 40
 E.R. 69-70 (emphasis added). No appeal was taken from this order.
 
 
 41
 The terms of the decree provided that the court could establish procedures for the resolution of disputes and thereafter could issue such orders as it deems necessary to assure compliance. This gave authority to the court to extend the continuing supervision of the court. The parties did not contest this extension but both actually sought relief under it. This resulted in the January 20, 1982 order, which extended the duration of the decree. However, that modification provided that there would be no further extensions of the decree "if at ... the expiration ... that there has been substantial compliance with the letter and the clear intendments of the Consent Decree."
 
 
 42
 During this time, the population of inmates under a death sentence increased to such an extent that they could no longer all be housed in North Seg. In order to avoid double celling of inmates, some of those inmates had to be transferred to another area of the prison. Thus, when the Inmates moved for contempt, the district judge noted that noncompliance was largely attributable to increases in the population of prisoners sentenced to death, not to the defendants' deliberate noncompliance. The court noted that there were substantial physical and security differences between the two prison areas and, thus, held that contempt was not warranted, but that modification of the consent decree was necessary. The court stated, "[r]ather it appearing to the Court that modification of the Decree will be necessary and that the parties are willing to attempt negotiations, this matter should be continued to allow the parties to negotiate necessary modifications of the Consent Decree." Thompson v. Enomoto, 542 F.Supp. 768, 770 (N.D.Cal.1982). The court entered its order on June 29, 1982 directing the parties to negotiate modifications to the decree. Id. Neither party appealed. Implicit in this order was the ruling that there had not been substantial compliance, that the jurisdiction to assure compliance was extended, and that the decree would be modified.
 
 
 43
 It comes way too late in these proceedings to contend after eight years of negotiation and four Monitor's reports that the terms of the consent decree required termination of the court's jurisdiction to assure compliance with the consent decree. It was extended and neither party objected or appealed.
 
 B. Applying Decree to all the Inmates
 
 44
 Basically, the prison officials' argument is that the district court incorrectly ruled that the consent decree was to apply to all the Inmates wherever housed. This argument may have had some merit eight years ago, but it comes far too late now. The basis for the June 29, 1982 order to negotiate modifications in the decree was that it was applicable to the Inmates who were housed in facilities other than North Seg. At that point, the prison officials could have objected to and appealed the court's order about the application of the decree to those Inmates not housed in North Seg. They did not do so.
 
 
 45
 Instead, prison officials continued to negotiate with the Inmates with regard to the modifications of the decree. Now, eight years after the Thompson decision ordering the parties to renegotiate, the prison officials argue that the decree is no longer in existence and if it is, it only applies to those Inmates in North Seg. If the decree had ceased to exist in 1982 or if the decree had been confined to North Seg Inmates, it would be nonsensical for the prison officials to have attempted to negotiate modifications to the decree for eight years for the Inmates housed outside North Seg.
 
 
 46
 Even if it were to be argued that the order to negotiate on this question was not an appealable order, a second clear opportunity to appeal this issue was explicitly raised after the Monitor filed his first report. He interpreted the decree to be limited to those Inmates confined in North Seg. The district court rejected that construction and in its order of December 18, 1986 held that the decree should be interpreted as applying to all the Inmates wherever housed. In his order of January 29, 1987, denying reconsideration of that order, he reemphasized that construction. Neither order was appealed.
 
 
 47
 In the district court's order of December 18, 1986 and its order of January 29, 1987, the district court explicitly considered the scope of the decree and determined that the decree applied to all the Inmates sentenced to death situated at San Quentin, wherever they were housed. Accordingly, the district court held that under the doctrine of law of the case, the extended coverage issue had already been decided. Since prison officials did not introduce substantially different evidence or any new and controlling authority when appealing the Monitor's Fourth Report, the court reaffirmed its prior ruling.
 
 
 48
 We agree with the district court. The modification of the decree to extend to all the Inmates sentenced to death wherever housed has been in effect for years. It would be nonsensical to permit the prison officials to appeal the issue of the applicability of the decree to the Inmates outside of North Seg at this juncture of the case. The prison officials had their opportunity to appeal the modification of the decree when the court ordered them to negotiate and when the court accepted the Monitor's First Report and modified the decree to extend to the Inmates wherever housed. This is the Monitor's Fourth Report. We will not allow prison officials four bites at the apple. Under the doctrine of law of the case, the court's interpretation of the decree must stand. See Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715-16 (9th Cir.1990) (explaining doctrine of law of the case).
 
 
 49
 The prison officials also assert that the district court could not modify the consent decree to extend to non-North Seg areas according to the principles of Firefighters Local 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In Firefighters, the Supreme Court considered whether a district court had the power to modify a Title VII consent decree which was silent about the issue of layoffs. The Court held that the disputed injunction, which barred layoffs of black firefighters and did not follow the bona fide seniority system plan, was not an order in aid of a valid interpretation of the decree or the decree's purpose. Id. at 573-76, 104 S.Ct. at 2585-86.
 
 
 50
 We do not find the prison officials' reliance on Firefighters to be persuasive. Firefighters held that a district court lacks the power to modify a consent decree in a manner that would conflict with the special protection given bona fide seniority systems under Title VII. Id. at 575, 104 S.Ct. at 2586. In Firefighters, the district court's expansive interpretation of the decree directly conflicted with a bona fide seniority system. Bona fide seniority systems are specifically protected under Title VII. Therefore, the decree, as interpreted by the district court in Firefighters, conflicted with Title VII, the statute which the decree initially sought to implement. The interpretation of the decree in this case does not conflict with any statutory or constitutional requirements.
 
 C. Eleventh Amendment Bar
 
 51
 Prison officials also moved to vacate the decree on Eleventh Amendment grounds, arguing that the decree was barred by the Eleventh Amendment because it no longer vindicated any substantive federal rights.
 
 
 52
 The action, when brought, was against state officials, not the state, to vindicate constitutional rights under the Eighth and Fourteenth Amendments. This is not barred by the Eleventh Amendment. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). A settlement of that litigation was reached and a consent decree entered. We are now dealing with a consent decree in an action against state officials to vindicate constitutional rights. The court subsequently interpreted the application of that decree. The consent decree, as interpreted by the court, presents no Eleventh Amendment problem.
 
 IV.
 INMATES' ARGUMENTS ON APPEAL
 
 53
 We now address the Inmates' cross-appeal. On their cross-appeal, the Inmates argue that the court abused its discretion in modifying the decree to deprive Grade B condemned inmates of various benefits they previously enjoyed. The Monitor's Fourth Report recommended that the decree be modified to take away the following items from Grade B condemned inmates:
 
 
 54
 (1) yard equipment;
 
 
 55
 (2) cell equipment and personal property;
 
 
 56
 (3) canteen items; and
 
 
 57
 (4) access to tier telephones.
 
 
 58
 While the Monitor conceded that virtually any item could be used by an inmate in a manner inconsistent with prison security, he also found that here the circumstances did warrant relieving prison officials of the obligations of the decree to provide this equipment to Grade B condemned inmates.
 
 
 59
 The court reviewed the Monitor's report and found that the report reflected a "very thorough review and consideration of all the evidence and relevant circumstances."[7] Further, the court held that the report gave extensive consideration to each of the provisions of the decree that prison officials requested be modified and made specific recommendations for each provision as to whether modifying the provision would be equitable. Moreover, the court determined that the Monitor applied the proper legal standard for determining whether modification of the decree in this respect was appropriate. We conclude that the court did not abuse its discretion in granting such modifications.
 
 
 60
 AFFIRMED.
 
 
 
 [1]
 The decree provides in pertinent part at Section ID:
 At the end of one year from the date of this decree, by which time the terms of this decree shall have been implemented, this action shall be dismissed in its entirety.
 
 
 [2]
 The initial inmate overflow was transferred to the Adjustment Center
 
 
 [3]
 Prior to the Inmates' request for a special master, the Inmates had filed another contempt motion against the prison officials. The district court, in March of 1983, found the prison in contempt for violating the visiting rights provisions of the decree with respect to the Inmates in North Seg and the Adjustment Center
 
 
 [4]
 In pertinent part, the Order of Reference states that:
 IT IS FURTHER HEREBY ORDERED that the powers of the Monitor are and shall be the following:
 
 
 [1]
 To enter, at any reasonable time, with or without advance notice, any part of any facility affected by the Consent Decree
 
 
 [2]
 To interview, on a confidential basis or otherwise, any person, including any correctional staff member or inmate, affected by the Consent Decree. Defendants shall provide suitable facilities and arrangements for the conduct of such interviews under conditions satisfactory to the Monitor
 
 
 [3]
 To attend institutional meetings and proceedings required by the Consent Decree
 
 
 [4]
 To obtain any document in the possession of any party relevant to the state of compliance with the Consent Decree or the state of conditions of confinement in any unit which presently houses or may in the future house condemned prisoners
 
 
 [5]
 To require the posting of notices in any part of any facility [sic] affected by the Consent Decree, in such number and form as the Monitor may direct
 
 
 [6]
 To convene hearings concerning any matter relating to the state of compliance with the Consent Decree or the state of conditions of confinement of condemned prisoners at San Quentin. To this end, the Monitor is empowered to require the attendance of witnesses, including both prisoners and employees of the California Department of Corrections, to make a record of the proceedings, and to exercise all other powers described in Federal Rule of Civil Procedure 53(c)
 
 
 [7]
 To retain from time to time experts, specialists, or other persons whose advice or testimony the Monitor deems necessary or desirable for the purpose of making findings concerning the conditions of confinement of condemned prisoners at San Quentin
 
 
 [8]
 To recommend at any time modification or withdrawal of this Order of Reference. Order of Reference at 2-3 (N.D.Cal.1980) (C-79-1630-SAW)
 
 
 [5]
 For purposes of the decree, inmates sentenced to death are classified into one of three groups: Grade A, Grade B, and Walk-alones. Grade B condemned inmates have a high escape risk or violence potential or are serious disciplinary or management cases
 
 
 [6]
 On December 18, 1989, prison officials served a motion to dismiss the Inmates' cross-appeal for failure to describe the Inmates who were appealing with the specificity required by Fed. R. App. P. 3(c). On January 9, 1990, this court denied the prison officials' motion
 
 
 [7]
 According to the Inmates, the Monitor's recommendations for modifying the decree as to the Grade B provisions at issue were based on two grounds: (1) that the modification would impose the same conditions on Grade B condemned inmates as on noncondemned segregated inmates; (2) that other modifications had been approved by the district court on earlier occasions. To the Inmates, these grounds for modification were impermissible
 While the Monitor did mention both of these grounds, the record shows that he based his recommendation to modify on specific facts and evidence. He did not, as the Inmates argue, base his decision merely on the two grounds asserted above.