**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

and

STATE OF IDAHO,
                      *Plaintiff,*

v.

ASARCO INCORPORATED; HECLA
MINING COMPANY,
              *Defendants-Appellees,*

and

COEUR D'ALENE MINES
CORPORATION; CALLAHAN MINING
CORPORATION; SUNSHINE PRECIOUS
METALS, INC.; SUNSHINE MINING
COMPANY, INC.,
                      *Defendants.*

No. 04-35052

D.C. No.
CV-94-00206-EJL

15675

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellant,*

and

STATE OF IDAHO,
                              *Plaintiff,*

            v.

COEUR D'ALENE MINES
CORPORATION; CALLAHAN MINING
CORPORATION; HECLA MINING
COMPANY; SUNSHINE PRECIOUS
METALS, INC.; SUNSHINE MINING
COMPANY, INC.,
                    *Defendants-Appellees.*

No. 04-35479

D.C. No.
CV-94-00206-EJL

UNITED STATES OF AMERICA,
                    *Plaintiff,*

          and

STATE OF IDAHO,
                    *Plaintiff-Appellant,*

          v.

ASARCO INCORPORATED; HECLA
MINING COMPANY,
                    *Defendants-Appellees,*

          and

COEUR D'ALENE MINES
CORPORATION; CALLAHAN MINING
CORPORATION; SUNSHINE PRECIOUS
METALS, INC.; SUNSHINE MINING
COMPANY, INC.,
                    *Defendants.*

No. 04-35106

D.C. No.
CV-94-00206-EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
June 7, 2005—Seattle, Washington

Filed December 5, 2005

Before: Warren J. Ferguson, Robert R. Beezer, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Ferguson

**COUNSEL**

Ronald M. Spritzer (briefed and argued) and Greer S. Goldman (briefed), Environmental and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for plaintiff-appellant United States.

Curt A. Fransen, Deputy Attorney General, Coeur d'Alene, Idaho, for plaintiff-appellant State of Idaho.

Elizabeth H. Temkin, Denver, Colorado, for defendant-appellee Hecla Mining Company.

## OPINION

FERGUSON, Circuit Judge:

In 1994, the United States and the State of Idaho (together, "Plaintiffs") entered into a consent decree with various mining companies, including Hecla Mining Company and Asarco, Inc. (together, "Defendants"), requiring the latter to perform certain cleanup actions in exchange for specific liability releases in the seriously contaminated Bunker Hill Superfund Site. The site, also known as "the Box," is a twenty-one square mile area surrounded by the Coeur d'Alene River Basin ("the Basin") in northern Idaho. In 2001, the District Court modified the consent decree for the Box ("the Box Decree" or "the decree") because it found that Defendants faced unanticipated liability outside the Box that made compliance with the decree substantially more onerous.

In 1996, the United States had filed an action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)[1] to recover from Defendants costs incurred in cleaning up environmental contamination in the heavily mined 1500 square mile Basin. In 2003, after the Environmental Protection Agency (EPA) had completed a remedial investigation and feasibility study of, as well as a record of decision (ROD) for, the Basin, the District Court

---

[1]CERCLA was enacted in 1980 and reauthorized and amended in 1986 by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (Oct. 17, 1986). 42 U.S.C. § 9601 *et seq*.

reduced Defendants' cleanup obligation under the Box decree by $7 million.

Plaintiffs presently contend that the District Court abused its discretion when it relied on extrinsic evidence, rather than the plain terms of the decree, to find that Defendants did not anticipate the EPA's contested action outside the Box. Because the decree in fact expressly reserved the United States' authority to take such action, we reverse the Court's modification order. In so doing, we hold that in modifying a consent decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure, a court must first interpret the terms and provisions of the decree as it would a contract to determine if the moving party anticipated a significant change in factual conditions, thereby making modification improper.

## I.   BACKGROUND

### A.   Bunker Hill Superfund Site

The EPA listed the Bunker Hill Superfund Site (hereinafter "the Box"), a twenty-one square mile area in Shoshone County, Idaho, on its National Priorities List in 1983 as one of the country's most contaminated sites. Over one hundred years of mining and sixty-five years of smelting activity, as well as various natural and man-made events, had caused widespread contamination in the area. The EPA's record of decision for the Box explained that, in particular, "[s]oils, surface water, ground water, and air throughout the [s]ite have been contaminated by heavy metals, to varying degrees, through a combination of airborne particulate deposition, alluvial deposition of tailings dumped into the river by mining activity, past waste disposal practices, and contaminant migration from onsite sources."

Section 104 of CERCLA permits the President to respond directly to releases or threatened releases of hazardous substances, such as those existing in the Box, by undertaking "re-

sponse actions" consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"). *See* 40 C.F.R. § 300.1-.86 (1985). Before selecting a response action, however, the NCP requires that the EPA first conduct a remedial investigation and feasibility study, which is designed to "assess site conditions and evaluate alternatives to the extent necessary to select a remedy" that will "eliminate, reduce, or control risks to human health and the environment." 40 C.F.R. § 300.430(a)(1)-(2). Potential response actions include a "remedial action," which is a cost-effective, long-term plan for a permanent remedy, and a "removal action," which is generally a short-term action intended to address only emergency situations. 42 U.S.C. § 9601(24), (23); *see* ROGER W. FINDLEY & DANIEL A. FARBER, ENVIRONMENTAL LAW 18687 (5th ed. 2000).

For purposes of the remedial investigation and feasibility study of the Box, the EPA divided the twenty-one square miles into populated and non-populated areas. The agency eventually issued a ROD for the populated areas in 1991 and a ROD for the non-populated areas in 1992. Taken together, the records of decision supported a remedial action in the Box targeting widespread heavy metal contamination in soils, surface water, and ground water and seeking to reduce associated risks to human health, particularly children's exposure to lead.

Between 1992 and 1994, Plaintiffs engaged in settlement negotiations with potentially responsible parties ("PRPs"), including Defendants, after filing a complaint against them to recover costs for the EPA's remedial action in the Box.[2] The

---

[2]While sections 106 and 107 of CERCLA authorize the Attorney General to sue responsible parties who have contributed to contaminating a Superfund site, including past, remote, and future owners, operators, generators, arrangers, and transporters, section 122(a) of CERCLA encourages settlement agreements between the United States and PRPs for expediting effective remedial action and minimizing litigation. *See* FINDLEY & FARBER, *supra*, at 202. The State of Idaho joined the complaint against Defendants pursuant to relevant state law and section 107 of CERCLA. *See* 42 U.S.C. § 9607.

parties agree that at the time of their negotiations the EPA expressed its intent not to use CERCLA remedial authority to clean up contamination (or "superfund" the area) outside the Box. Instead, it planned to address the environmental contamination in that area through the Coeur d'Alene Basin Restoration Project ("the Basin Restoration Project"), a cost-effective, long-term approach, not a "response action," that was designed to be a public and private venture among local, state, and federal agencies, the Coeur d'Alene Tribe, and private property owners in the Basin (including Defendants).

In 1994, the District Court entered the parties' settlement as a consent decree in which Defendants, among other PRPs, agreed to perform certain cleanup actions in the Box's populated areas and Plaintiffs assumed primary responsibility for the Box's non-populated areas. The parties agree that the United States explicitly reserved in the decree the right to pursue PRPs for "liability arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside the Site." Consent Decree (CD) ¶ 90(2). In addition, no party disputes that, under the decree, the United States "retain[ed] all authority and reserve[d] all rights to take *any and all* response actions authorized by law." CD ¶ 93 (emphasis added). Moreover, the parties recognize that the decree limited the United States' covenant not to sue the PRPs strictly to the Box. CD ¶ 84a.

## B.   Modification of Consent Decree

In March 1996, nearly two years after the District Court had approved the consent decree for the Box, the United States, at the request of the EPA, the Department of the Interior, and the Department of Agriculture, filed an action to recover from PRPs, among other things, damages under CERCLA for injury to natural resources in the heavily mined Basin, that is, the area outside the Box.[3] In early 1998, the

---

[3]The State of Idaho is not a party to the Basin litigation. It nonetheless asserts that the consent decree for the Box should remain distinct from the unresolved disputes concerning the Basin.

EPA publicly announced that it would be conducting a remedial investigation and feasibility study of the Basin. Three years later, in January 2001, Defendants filed a motion in the District Court of Idaho to modify the consent decree, contending that the EPA's decision to superfund the Basin constituted an unanticipated change in factual circumstances that made compliance with the Box decree substantially more onerous.

In particular, Defendants alleged that the EPA had repeatedly assured them that it would not expand the Superfund site from the Box to the Basin.[4] Despite recognizing that the decree specifically reserved the United States' right to superfund the Basin, the District Court relied on oral and written assurances that the EPA had allegedly given Defendants prior to and after entering the decree to find that the latter did not anticipate the contested action. The Court found that between 1991 and early 1998, the EPA consistently stated "that actions outside the Box would be coordinated with the broader objectives of the Coeur d'Alene Restoration Project . . . and regulatory tools *other than* remedial authority under CERCLA." The Court explained that "[t]his finding [was] based on repeated representations and references to the 'multi-media approach' in letters, in the 1991 and 1992 RODs . . . in conversations with EPA management, in the [Basin Restoration Project] Framework document and in Department of Justice pleadings to the Court in this case and in *United States v. Asarco, et al.*, 96-122-N-EJL." On September 30, 2001, the Court held that modification of the decree was appropriate because enforcement of the decree as it stood would drive

_____

[4]We note that Defendants previously challenged the EPA's expansion of the Superfund site boundaries from the Box to the Basin in *United States v. Asarco Inc.*, 214 F.3d 1104 (9th Cir. 2000). We held there that while the EPA gave adequate notice of the expansion, the D.C. Circuit had exclusive jurisdiction to rule on any challenge to the expanded boundaries. *Id.* at 1107. Defendants subsequently filed a notice with this Court indicating that they were not filing an appeal in the D.C. Circuit, in effect abandoning their formal challenge to the EPA's expansion of the Superfund site boundary lines.

"the mining industry out of business" and "bleed[ ] the companies to death."

The District Court nevertheless withheld deciding on actual modifications to the consent decree until the EPA had completed the Basin's remedial investigation and feasibility study and ROD. The EPA issued the ROD in September 2002, and the Court issued an order on November 18, 2003 reducing Defendants' financial obligation under the decree by $7 million.[5] The Court subsequently approved the parties' allocation of the $7 million in an April 16, 2004 order. Plaintiffs timely appealed the Court's last two orders, which this Court has consolidated for purposes of this appeal.

## II.  STANDARD OF REVIEW

Motions for relief from judgment under Rule 60(b) are reviewed for abuse of discretion. *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004) (citing *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001)). "A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Casey*, 362 F.3d at 1257 (citing *Bateman v. United States Postal Serv.*, 231 F.3d 1200, 1223 (9th Cir. 2000)). Here, because the facts are generally undisputed, we face a mixed question of law and fact. A mixed question of law and fact exists when there is no factual dispute, the rule of law is clear,

---

[5]The District Court arrived at $7 million by considering the original, undisputed estimated cost for the Box ($40 million), the expenditures to date ($44.7 million), and the estimated cost of the remaining work in the Box ($27 to $35 million in present value). Although the Court conceded that "[Defendants'] liability for the Basin is still unknown," it 1) subtracted $40 million from $44.7 million, which is $4.7 million; 2) added that amount to $31 million (the middle figure in the range of estimated remaining costs for the Box), which is $35.7 million; and 3) calculated 20% of that amount, which is $7.14 million. Notably, the District Court failed to explain the basis for reducing Defendants' obligations by approximately 20%.

and the question is whether the facts satisfy the legal rule. *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982). Mixed questions of law and fact are reviewed de novo. *United States v. City of Spokane*, 918 F.2d 84, 86 (9th Cir. 1990).

## III.   DISCUSSION

**[1]** The District Court modified the consent decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure, which provides in relevant part that a court may relieve a party from a final judgment when—

> the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is *no longer equitable* that the judgment should have prospective application[.]

(emphasis added.) "[This] Rule codifies the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees[.]" *Bellevue Manor Assoc. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999) (internal quotations and citations omitted).

**[2]** In *Rufo v. Inmates of Suffolk County Jail*, the Supreme Court articulated the applicable two-prong standard for modifying a consent decree under Rule 60(b)(5). 502 U.S. 367 (1992). The moving party must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree. *Id.* at 384. The district court must then determine whether the proposed modification is suitably tailored to resolve the problems created by the changed factual or legal conditions. *Id.* at 391. In particular, "[i]f the movant cites significantly changed factual conditions," as Defendants do here, "it must additionally show that the changed conditions make compliance with the consent decree 'more onerous,' 'unworkable,' or 'detrimental to the public interest.' " *Small v. Hunt*, 98 F.3d 789, 795 (4th Cir.

1996) (quoting *Rufo*, 502 U.S. at 384). A court should not ordinarily modify a decree, however, "where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385 (citation omitted).

Defendants bore the initial burden in the District Court of showing that the EPA's decision to superfund the Basin constituted a significant and unanticipated change in factual conditions warranting modification of the decree. *See id.* at 384-85. "If it is clear that [Defendants] anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, [Defendants] would [then] have to satisfy a heavy burden to convince a court that [they] agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id*. at 385. We refer to this latter requirement as the heavy burden standard.

We recognize Defendants' valid concern that Rule 60(b)(5) should be treated as a flexible standard. Defendants correctly maintain that the Rule is designed to provide judges with discretion and flexibility in modifying a decree. In *Rufo*, the Supreme Court explains that "[b]ecause such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." *Id.* at 380 (citation omitted). But the likelihood of significant changes occurring over the life of the decree does not mean that courts have unbridled discretion to modify a decree when a party actually anticipated the changed factual circumstances in question. *Rufo* makes clear that "on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application[.]" *Id.*

Accordingly, we address two questions in this appeal. First, did Defendants anticipate at the time they entered into the decree that the EPA would superfund the Basin? Second, if

so, did Defendants satisfy the heavy burden standard established in *Rufo*? We find that Defendants indeed anticipated that the EPA might superfund the Basin and, in addition, failed to meet the heavy burden standard because they did not make a reasonable effort to comply with the decree. Thus, we need not address whether the actual modification of the decree is suitably tailored under *Rufo*'s second prong in order to conclude that the District Court abused its discretion in modifying the consent decree.

## A.  Defendants Anticipated the EPA's Contested Action

The parties do not challenge on appeal the consent decree's unequivocal terms or conditions. In fact, they agree that under the decree, the United States "retain[ed] all authority and reserve[d] all rights to take any and all response actions authorized by law." CD ¶ 93. Moreover, Defendants notably stated in their answering brief to this Court that "[t]he companies in this case have never questioned [the] EPA's authority to exercise CERCLA authorities outside the Box. In this regard, the governments are correct that the Decree's reservation of rights confirms the parties' expectation that the EPA *might* take such action." The District Court also found in no uncertain terms "no legally binding commitment either in the Consent Decree or in the related Records of Decision that would prohibit the EPA from using full CERCLA remedial authority outside the Box."

The exact issue here, then, is whether the District Court erred in modifying Defendants' obligation under the decree on the basis of extrinsic evidence that suggests that Defendants did not anticipate the contested action. Ultimately, we must determine to what extent contract principles apply when modifying a consent decree as a matter of equity under Rule 60(b)(5).

### 1.  *Consent Decrees*

**[3]** Without question courts treat consent decrees as contracts for enforcement purposes. A consent decree, like a con-

tract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree. In *United States v. Armour & Co.*, for example, the Supreme Court found that defendant, a meat packing company, did not violate the terms of the meat packers consent decree of 1920, which forbade meat packing companies from owning grocery stores, by allowing Greyhound to buy an ownership share of its stock while simultaneously owning grocery subsidiaries. 402 U.S. 673, 682-83 (1971). The Court reasoned that if the government wanted to prevent a single corporation like Greyhound from owning both meat packing companies and grocery stores, it should have provided such a prohibition in the decree. After all, "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. . . . Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Id.* at 681.

The Supreme Court rearticulated its *Armour* holding in *United States v. ITT Cont'l Baking Co.*, where it considered extrinsic evidence to interpret a vague term in a consent decree. 420 U.S. 223 (1975). The case involved a Federal Trade Commission consent order prohibiting baking companies such as ITT Continental from "acquiring" other baking companies. In construing the term "acquiring" in the decree, the Court took into account evidence of events surrounding the negotiation of, and other documents incorporated in, the decree. The Court explained that "[s]uch reliance [on extrinsic evidence] does not in any way depart from the 'four corners' rule of *Armour*" because where contract terms are ambiguous, "reliance upon certain aids to construction is proper, as with any other contract." *Id.* at 238.

This Court has applied contract principles in accordance with Supreme Court precedent when interpreting consent decrees. *See Molski v. Gleich*, 318 F.3d 937, 956 (9th Cir.

2003) (Graber, J., specially concurring) (stating that "[i]n construing a consent decree, we apply the same principles used to interpret a contract.") (citing *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990)); *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) (discussing how "[a] consent decree is . . . 'in some respects contractual in nature' " and, as such, "[c]ourts must find the meaning of a consent decree 'within its four corners[ ]' ") (citing *Rufo*, 502 U.S. at 378; *Armour & Co.*, 402 U.S. at 681-82); *Enomoto*, 915 F.2d at 1388 (explaining that "[i]n construing consent decrees, courts use contract principles").

## 2. *Modification Under Rule 60(b)(5)*

Defendants contend, however, that a court need not interpret a consent decree within its four corners in order to modify it. Since Rule 60(b)(5) is a rule grounded in equity, Defendants maintain that courts must instead weigh the totality of the circumstances when determining if a moving party anticipated a contested change in factual circumstances.

We disagree with Defendants because modification of a consent decree invariably hinges on interpretation of the very terms of the decree. That is, in order to discern if Defendants anticipated that the EPA might superfund the Basin, we must first interpret the decree, which embodies the parties' careful negotiation and enforceable commitments. Only if the decree's terms are ambiguous—for example, if it is not clear in the decree whether Defendants anticipated the EPA's contested action—do we consider extrinsic evidence.

This case does not present a novel issue. The Fourth Circuit's decision in *Thompson v. HUD* illustrates how a court, in modifying a consent decree, must necessarily first interpret the terms of the decree. 220 F.3d 241 (4th Cir. 2000). *Thompson* involved a group of African American public housing residents who entered into a consent decree with the United States Department of Housing and Urban Development

(HUD) requiring that new family housing financed with public funds be located in non-impacted areas (areas without high concentrations of minority residents or public housing). The decree purported to eliminate racial segregation and discrimination in Baltimore's public housing system. But instead of abiding by the decree, the local defendants decided that a more viable plan than the one agreed to would be to construct senior housing in impacted areas. The district court modified the consent decree to allow local defendants to seek federal funds for their new plans.

The Fourth Circuit reversed the district court on the ground that a particular section in the consent decree, into which the parties knowingly and voluntarily entered, "provide[d] that, until the other obligations under the Decree ha[d] been satisfied, any new construction of public housing built with public housing funds must be located in a non-impacted area." *Id.* at 247. The plain terms of the decree, despite the viability of the senior housing plans, "ma[d]e[ ] it clear that the parties contemplated that new construction would be required or desired during the life of the Consent Decree." *Id.* Because the local defendants anticipated this change in factual circumstances, the Fourth Circuit found that modification of the decree was unwarranted.

The Fourth Circuit's decision in *United States v. Bishop Processing Co.*, although predating *Rufo*, further supports our understanding that a court must first interpret the decree in deciding whether to modify it on the basis of changed factual circumstances. 423 F.2d 469 (4th Cir. 1970). There, the Fourth Circuit refused to modify a consent decree to include limitations that appeared nowhere in the agreement. The Bishop Processing Company, operator of a rendering and animal reduction plant, entered into a consent decree with the United States and the states of Delaware and Maryland; the decree required Bishop to cease all manufacturing and processing of malodorous air pollution upon a filing of an affidavit by the Director of Delaware's Air Pollution Control

Division stating that Bishop was discharging malodorous air pollution across state lines. After being ordered twice to cease operations, Bishop contended that the decree was entered into with various "understandings" about investigative procedures to be used by the Director, procedures inconsistent with the ones that the Director had used in reporting Bishop's actions. *Id.* at 472.

Our sister circuit found Bishop's "understandings" unavailing because "Bishop had ample opportunity to propose incorporation in the decree of any protection it may have felt necessary, and to object to procedures it deemed contrary to its understanding of the decree's terms." *Id.* It added that "[Bishop] cannot now ask the court to revise the decree by inserting language or to interpret it to embrace matters which, if present at all, were lurking in the recesses of Bishop's corporate mind." *Id.*

**[4]** Here, as in *Thompson*, the plain terms of the consent decree reveal the parties' expectation that a particular change in factual circumstances might occur during the lifetime of the decree. In fact, the decree provided that the United States reserved its "rights to take any and all response actions authorized by law" and to pursue Defendants for liability for response costs incurred outside the Box. CD ¶¶ 93, 84a. As in *Bishop*, Defendants also had "ample opportunity to propose incorporation" of a provision in the decree prohibiting or limiting the EPA from superfunding the area outside the Box. *Bishop*, 423 F.2d at 472. Indeed, Defendants conceded at oral argument and in their answering brief that the "EPA refused to provide any commitments in the Box Decree as to its intentions outside the Box." The District Court itself recognized that "if such a [binding] commitment [on the Basin] had been reached . . . such a commitment would have been drafted into the decree." As in *Bishop Processing Co.* and *Thompson*, we find that the decree in this case is plain in its terms and, as such, Defendants anticipated that the EPA might superfund the area outside the Box.

Defendants' reliance on *Bellevue Manor Assoc. v. United States* as a case establishing a totality of the circumstances test for modification is unavailing. 165 F.3d 1249 (9th Cir. 1999). *Bellevue* does not announce such a test. We merely expanded *Rufo*'s application in *Bellevue* to all petitions brought under Rule 60(b)(5), which "is routinely used to challenge the continued validity of consent decrees, which courts often liken to contracts." *Id.* at 1253 (footnote and citation omitted). In particular, we found that a purely private commercial contract between HUD and private landlords who participated in a federal rent subsidy program could be challenged under Rule 60(b)(5) because the Rule's plain language does not except final judgments interpreting commercial contracts, and courts have applied the Rule in essentially private cases. In short, *Bellevue* does not support Defendants' position.

Were we to replace the unambiguous language in the consent decree, providing that the EPA could superfund the Basin, with Defendants' contrary "understanding" that the EPA promised it would not do so, we would defy the decree's specific purpose. The decree purports to hold Defendants, who are potentially responsible parties, accountable for eliminating the waste and contamination in the Box's populated areas. To hold otherwise would also strip the decree of its broader purpose, "which is to enable parties to avoid the expense and risk of litigation while still obtaining the greater enforceability (compared to an ordinary settlement agreement) that a court judgment provides." *Jeff D. v. Kempthorne*, 365 F.3d 844, 852 (9th Cir. 2004) (citations omitted).

### 3. *Extrinsic Evidence*

Even assuming that the consent decree's terms are ambiguous, there is conflicting evidence at best as to the EPA's promises to Defendants that it would not superfund the area outside the Box. Indeed, in its November 24, 1992 letter to Defendants regarding the Bunker Hill Site/Coeur d'Alene

Basin, the EPA explained that "[it] [did] not *currently intend* to expand the use of CERCLA remedial authorities beyond those actions outlined in the Bunker Hill [ROD]." (emphasis added.) It also stated that "[t]he success of [the Basin Restoration Project] *depends* on cooperation and coordination with affected private parties and public land management agencies." (emphasis added.) The EPA's statements were statements of present intent, not enforceable promises.

Additionally, when the EPA's attorney asked Asarco's lawyer, James L. Woods, during his September 21, 2001 deposition whether "anyone from EPA ever t[old] [him] that the Agency would never, ever exercise Superfund remedial authority outside of the Box" or "expand the bounds of the Superfund site," Woods replied with the following:

> I believe—can I point to a specific statement to that effect, no. But I had the clear intention that that's what they were saying. The direct answer to your question is I do not recollect a specific statement to that effect.

Woods's statement demonstrates that even if we were to consider extrinsic evidence, Defendants cannot prove that the EPA promised them, unequivocally or explicitly, that it would not superfund the area outside the Box.

[5] Accordingly, while the District Court found that "all of the parties to the Consent Decree hoped the [Basin Restoration Project] would be successful in cleaning up the Basin," we find that these expectations are not a basis for modifying the decree. Mere hopes do not translate into enforceable promises. The EPA expressly reserved in the decree the right to superfund the area outside the Box and, as such, Defendants anticipated this change in factual circumstances. The District Court erred in concluding that Defendants did not anticipate this change in circumstances on the basis of extrinsic evidence.

## B.  Defendants Made No Reasonable Effort to Comply with the Decree

**[6]** Because the District Court concluded that changed factual circumstances were not anticipated, it did not apply the appropriate heavy burden standard established in *Rufo*. When a party anticipates changing conditions that would make performance of the decree more onerous, "the party [must] satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385. We must therefore decide whether to remand to the District Court, or determine on the basis of the record before us whether Defendants meet this burden.

The Fourth Circuit addressed a similar situation in *Thompson*, 220 F.3d 241. There, the district court also rejected the plaintiffs' contention that any change in circumstances was anticipated at the time of the consent decree, and so did not analyze the defendants' modification request under the proper heavy burden standard. The Fourth Circuit did not remand the case, however, because it had a "[fully-developed] record [that] reveal[ed] no evidence that the Local Defendants made a reasonable effort to comply with the requirements . . . of the Consent Decree, as required by *Rufo*." *Id.* at 248. The local defendants, for example, neither investigated funding the senior housing project through use of monies not prohibited by the decree nor evaluated locating the senior village in a non-impacted area.

**[7]** Here, as in *Thompson*, a remand is not required. The District Court held an evidentiary hearing on the modification request, and we have a fully-developed record to review. *See Bellevue*, 165 F.3d at 1257 (explaining that a "[r]emand is not necessary where the issue has been fully briefed on appeal, the record is clear and remand would 'impose needless additional expense and delay . . .' " (quoting *In re Pintlar Corp.*,

133 F.3d 1141, 1145 (9th Cir. 1998))). In seeking to justify a modification to the decree, Defendants allege that the EPA's decision to superfund the Basin has significantly impacted their financial footing. The record before us, however, does not provide any definitive indication that Defendants' financial situation is in peril or that its situation has significantly changed as a result of the EPA's decision to superfund the Basin. Rather, Defendants' allegations are at best speculative given that it is unclear what liability Defendants now face in the Basin compared to what they would have faced under the Basin Restoration Project. We do not accept that Defendants have made reasonable efforts to comply with the decree, or have met their heavy burden in this case, where the cost of compliance is unknown and the proper baseline against which to measure any increase in liability remains indeterminate.

**[8]** Because Defendants have not made any reasonable efforts to comply with the decree, we find that they should not be relieved under Rule 60(b)(5) of their obligations in the Box.

## IV. CONCLUSION

For the foregoing reasons, we reverse the District Court's order modifying the consent decree at issue in this case.

**REVERSED.**