**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LABOR/COMMUNITY STRATEGY
CENTER; BUS RIDERS UNION;
SOUTHERN CHRISTIAN LEADERSHIP
CONFERENCE OF GREATER LOS
ANGELES COUNTY; KOREAN
IMMIGRANT WORKERS ADVOCATES;
MARIA GUARDADO; RICARDO
ZELADA; NOEMI ZELADA,
          *Plaintiffs-Appellants,*

v.

LOS ANGELES COUNTY
METROPOLITAN TRANSPORTATION
AUTHORITY; ROGER SNOBLE,
          *Defendants-Appellees.*

No. 06-56866

D.C. No.
CV-94-05936-TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted
May 12, 2008—Pasadena, California

Filed May 5, 2009

Before: Mary M. Schroeder, Barry G. Silverman, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Berzon

---

**COUNSEL**

Karen M. Lockwood (argued), Howrey LLP, Washington, DC, Ethan B. Andelman, Howrey LLP, San Francisco, California, Katherine M. Basile, Howrey LLP, East Palo Alto, California, Richard A. Marcantonio, Angelica K. Jongco, Public Advocates, Inc., San Francisco, California, for the plaintiffs-appellants.

Caroline H. Mankey (argued), Patricia L. Glaser, James S. Schreier, Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP, Los Angeles, California, Raymond G. Fortner, Jr., County Counsel, Charles M. Safer, Assistant County Counsel, Office of the Los Angeles County Counsel, Los Angeles, California, for the defendants-appellees.

---

**OPINION**

SILVERMAN, Circuit Judge:

This appeal arises after fourteen years of litigation concerning public transit in Los Angeles County. In 1994, the Labor/Community Strategy Center and other Los Angeles County community organizations and local residents, known collec-

ively as the "Bus Riders Union" or "BRU," brought a civil rights class action against the County's Metropolitan Transit Authority, charging the MTA with unlawfully discriminating against "inner-city and transit dependent bus riders" in its allocation of public transportation resources. The case did not go to trial; rather, in 1996, the parties agreed to, and the district court approved, a consent decree that committed MTA to implementing "a detailed plan to improve bus service." *See Labor/Community Strategy Ctr. v. L.A. County Metro. Trans. Auth.*, 263 F.3d 1041, 1043 (9th Cir. 2001) ("*Labor/ Community*"). The district court's jurisdiction over the decree was explicitly set to expire in ten years.

Shortly before the tenth anniversary of the decree, BRU moved to extend the duration of the decree on the grounds that MTA had allegedly failed to comply with the decree's overcrowding provisions. BRU also sought civil contempt sanctions against MTA for MTA's alleged failure to comply with a 2004 remedial order. Ruling that MTA had substantially complied with the decree, the district court denied BRU's motion seeking these remedies and allowed the decree to expire.

We hold today that the district court did not abuse its discretion in denying BRU's motion to extend the decree and for contempt sanctions. We therefore affirm the district court's decision in all respects.

## I.   Background

### A.   The Underlying Lawsuit

In 1994, BRU filed a class action under several federal civil rights statutes,[1] charging MTA with violating the Fourteenth Amendment by discriminating against low income and minority residents of Los Angeles County. The alleged discrimina-

---

[1]The complaint relied upon 42 U.S.C. §§ 1981, 1983, and 2000d.

tion included expending a disproportionately high share of its resources on commuter rail services, whose primary users were wealthy non-minorities, and a disproportionately low share on bus services, whose main patrons were low income and minority residents.[2]

In March 1995, the district court certified a plaintiff class of "[a]ll poor minority and other riders of MTA buses who are denied equal opportunity to receive transportation services because of the MTA's operation of a discriminatory mass transportation system." On the eve of trial the parties submitted a proposed consent decree, which the district court approved on October 29, 1996. *See Labor/Community*, 263 F.3d at 1043.

## B.   The Consent Decree

The decree committed MTA to a wide array of improvements in its bus services, including instituting new bus lines to and from centers of employment, education, and health care in the county; enhancing security on buses; improving bus shelters; and maintaining its fares at specific levels. BRU's present appeal does not directly concern those aspects of the decree.

BRU does contest MTA's compliance with Section II.A of the decree, which committed MTA to "[r]educing [o]vercrowding [b]y [a]dding [n]ew [s]ervice." The decree did not set out a specific number of buses or hours of service the MTA needed to add to achieve appropriate reductions in overcrowding. Instead, the decree set forth specific "load factor targets," to be met by specific dates, and provided MTA with "discretion in determining how the targets w[ould] be met." A "load factor" is "a numerical representation of the number of people standing [and sitting] on a bus in relation to the

---

[2]The allegations made in the underlying complaint are discussed in more detail at *Labor/Community*, 263 F.3d at 1043.

number of seats." *Labor/Community*, 263 F.3d at 1044 n.1. For example, a forty-seat bus which contained forty-eight passengers would have a load factor of 1.2. Under the terms of the decree, MTA was required to reduce the maximum load factor for each relevant bus line to 1.35 by December 31, 1997, 1.25 by June 30, 2000, and 1.2 by June 30, 2002.

In addition to these substantive provisions, the decree included a number of procedural mechanisms designed to assure implementation and enforcement. Four are relevant to this appeal.

First, the decree created a Joint Working Group, composed of representatives from BRU and MTA. The purpose of the Working Group was to "foster cooperation in the implementation" of the decree and to resolve disputes between the parties.

Second, Section V of the decree established the position of "Special Master," "to facilitate the resolution of disputes arising under any provision of this Consent Decree" that could not be settled by the Working Group. The parties agreed that Donald T. Bliss would serve as the initial Special Master.

Third, Section VI, entitled "Modification of the Consent Decree," set forth the conditions under which the decree may be modified. Under Section VI, a party seeking modification must show "that a significant change in circumstances warrants revision of the Consent Decree, and that the proposed revision or revisions are suitably tailored to the changed circumstances."

Finally, Section VIII provided that the "District Court shall retain jurisdiction over this litigation for ten years from the date of approval of this Consent Decree in order to monitor compliance with this Consent Decree." The court approved the decree on October 29, 1996, so the court's obligatory

retention of jurisdiction was set to terminate on October 29, 2006. Section VIII stated further that:

> At the end of seven years, MTA may file a motion with the District Court to terminate the Consent Decree and the Court shall grant such motion if MTA shows to the Court's satisfaction that it has substantially complied with the Consent Decree and that it has in place a service plan that will enable continued adherence to the principles and objective of the Consent Decree during the five years subsequent to the termination of this Consent Decree.

## C.   The 1999 and 2004 Orders

In September 1998, the members of the Working Group agreed that on seventy-five out of the seventy-nine bus lines monitored, MTA had not met the initial load factor target of 1.35 by the December 31, 1997 deadline. *See Labor/Community*, 263 F.3d at 1046. As the parties' representatives could not agree on a remedial plan to address this failure, and also to ensure that MTA would meet the second target of 1.25 by June 30, 2000, the Special Master issued an order on March 6, 1999 mandating a plan which, as later revised, required, among other things, that MTA acquire 379 additional buses. *Id.* at 1047.

MTA sought review of the 1999 Order, questioning both the Special Master's authority to impose it and the validity of the factual findings and interpretation of the decree on which it was premised. *Id.* The district court upheld the Special Master's findings regarding the agency's noncompliance with the 1997 1.35 load factor target as not clearly erroneous, and affirmed the 1999 Order as to the 248 buses that MTA was required to purchase to meet the 1997 target. At the same time, the district court declared it "too early to determine whether the MTA is incapable of meeting" the 2000 load factor target, so it vacated the Special Master's Order with regard

to the remaining additional buses and directed the Special Master to reevaluate the need for those buses once more up-to-date data were available. We affirmed the district court's order in *Labor/Community*. 263 F.3d at 1051.

On January 12, 2004, the Special Master promulgated another order addressing measures necessary for MTA to achieve compliance with the load factor targets. The "Final Order on Remedial Service Plan to Meet 1.25 and 1.2 Load Factor Target Requirements" specified that "[i]n order to achieve compliance with the Consent Decree and to meet and maintain the 1.2 [load factor target]," MTA was required to provide the additional buses and service hours called for by the Working Group. The Order permitted MTA to meet some of the additional requirements through changes to existing services and more efficient scheduling of its existing fleet. But it required MTA to purchase "the vehicular equivalent of 145 new 40-seat expansion buses" and to provide "an additional 290,145 annual in-service hours." The Final Order stated that providing this expanded service, along with the other improvements specified, would constitute "substantial compliance with the load factor targets of the Consent Decree and create a presumption that [its] expansion bus procurement requirements . . . have been met."

## D.   The District Court's Ruling

In February 2006, the Special Master resigned. Although BRU and MTA agreed on a replacement, the district court did not appoint a new Special Master, citing the limited "amount of time remaining before the Court is divested of jurisdiction over the . . . Decree." The court indicated, however, that if its "jurisdiction is extended, it will revisit this issue."[3]

---

[3]BRU asserts that the district court's failure to appoint a new Special Master violates the decree. Neither BRU nor MTA timely appealed that order, so we lack jurisdiction to review it. *See* 28 U.S.C. § 2107.

After the district court declined to appoint a new Special Master, BRU filed motions to extend the duration of the decree and for contempt sanctions.[4] The district court denied both. It concluded that contempt sanctions were inappropriate because BRU had failed to satisfy its burden of "establish[-ing], by clear and convincing evidence, that MTA either failed to substantially comply with the Final Order or failed to take all reasonable steps to insure compliance with the Final Order." On the contrary, the court held, "it is clear that MTA has substantially complied, and taken all reasonable steps within its power to insure compliance, with the Final Order."

Moreover, the district court stated, extension of the decree was unnecessary because the "Decree did not require perfection," and "[d]espite an increasing ridership, increasing traffic congestion and fiscal constraints, MTA has substantially complied with the Consent Decree while maintaining fares at reasonable levels." The district court concluded that the decree "has served its purpose and will not be extended." BRU timely appealed.

## II.   Standard of Review

We review a district court's interpretation of a consent decree *de novo*, with "deference . . . based on the court's extensive oversight of the decree from the commencement of the litigation to the current appeal." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 855 (9th Cir. 2007). Both a district court's refusal to extend a consent decree and its denial of a motion for contempt are reviewed for abuse of discretion. *See Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 827 (4th Cir. 2005); *Hallett v. Morgan*, 296

---

[4]BRU originally brought motions to extend the duration of the decree and for contempt before the Special Master in 2004. The Special Master denied the former, without prejudice, as premature; the latter remained pending at the time of his resignation.

F.3d 732, 749 (9th Cir. 2002); *David C. v. Leavitt*, 242 F.3d 1206, 1210 (10th Cir. 2001); *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 281 (3d Cir. 2001); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994). A district court abuses its discretion when "its equitable decision is based on an error of law or a clearly erroneous factual finding." *Kenney v. United States*, 458 F.3d 1025, 1032 (9th Cir. 2006).

## III.   Discussion

## A.   Extension of the Decree

**[1]** By its express terms, the decree provided for the district court's retention of jurisdiction over compliance with the decree only until October 29, 2006, ten years after its execution.[5] Because the decree contains an express expiration date for the court's retention of jurisdiction, any change to that date entails a modification of the decree. *See Thompson*, 404 F.3d at 824 (holding that extension of a consent decree's termination date required modification of the decree). The first issue, then, is whether, and under what conditions, a modification of the decree is permitted.

**[2]** To answer this question, we turn first to the decree itself. *See United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th

---

[5]BRU argues that "[t]he Decree contains no termination date" and therefore that the district court lacked the discretion to end its jurisdiction until MTA complied fully with the terms of the decree. BRU did not raise this issue before the district court and we generally will not consider an issue raised for the first time on appeal. *See Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985). BRU argues that the issue is one of law and can be resolved on the record as it presently exists. We decline to exercise our discretion to consider the issue because it may turn upon facts that MTA did not have an opportunity to develop before the district court, namely, extrinsic evidence of the parties' intent. *See id.* (declining to address issue not raised below because of possibility of relevant facts not developed in the record).

Cir. 2005) (noting that the meaning of "[a] consent decree, like a contract, must be discerned within its four corners"). According to Section VI of the decree, modification of the decree is permitted only if the party seeking modification establishes that (1) "a significant change in circumstances warrants revision" and (2) "the proposed revision or revisions are suitably tailored to the changed circumstances." The decree further provides that modification "may be warranted when changed factual conditions make compliance with the Consent Decree unworkable or substantially more onerous, and when the changed factual conditions were unforeseen at the time of the entry into this Consent Decree." Perhaps not surprisingly, these requirements are essentially identical to those articulated by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992), and applied by this Court in *Asarco* and other cases involving modifications to consent decrees. *See Asarco*, 430 F.3d at 979; *Hook v. Arizona*, 120 F.3d 921, 924 (9th Cir. 1997). So, as provided both by the decree and by the *Rufo* case law, BRU's requested modification — i.e., extension of the district court's jurisdiction over the decree — is warranted only if the following four conditions are met. First, BRU must establish that a "significant change either in factual conditions or in the law" occurred after execution of the decree. *See Asarco*, 430 F.3d at 979. Second, it must demonstrate that the change was not "anticipated at the time it entered into [the] decree." *Id.* Third, it must show that the changed factual circumstance makes "compliance with the consent decree more onerous, unworkable, or detrimental to the public interest." *Id.* (internal citations omitted). Finally, the proposed extension of the decree's termination date must be "suitably tailored to resolve the problems created by the changed . . . conditions." *Id.*

**[3]** The failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances that would justify the decree's temporal extension. *See Thompson*, 404 F.3d at 828-29; *David C.*, 242 F.3d at 1212; *Vanguards of Cleveland*, 23 F.3d at 1019-20; *Hol-*

*land*, 246 F.3d at 283-84. Here, however, after overseeing this case for more than twelve years, the district court concluded that MTA *had* substantially complied with the decree. The court ruled as follows:

> For the past ten years — the entire term of the Consent Decree — the parties have disagreed as to how to implement the Consent Decree, how to reach its objectives, and how to measure its success. In hindsight, the Consent Decree was a less than perfect document. As a result, it is impossible to achieve absolute compliance. Indeed, the Special Master informed the parties that the Consent Decree did not require perfection. [Citation] However, it was possible for MTA to substantially comply with the Consent Decree. Despite an increasing ridership, increasing traffic congestion and fiscal constraints, MTA has substantially complied with the Consent Decree while maintaining fares at reasonable levels. The Consent Decree has served its purpose and will be not extended. . . . As a result of the Consent Decree and the efforts of all of the parties, the quality of life has improved for Los Angeles's public transit dependant poor population.

**[4]** The court's finding that the decree "had served its purpose" reflected a conclusion that it was no longer necessary to involve the federal courts in the day-to-day operation of the Los Angeles County bus system. The district court, armed with a decade of knowledge about the case, was uniquely positioned to determine whether there had been substantial compliance. We accord that court's decision deference on this issue. *See Thompson*, 404 F.3d at 827 (noting deferential standard of review in institutional reform cases and stating that "[o]ver time, the district court gains an intimate understanding of the workings of an institution and learns what specific changes are needed within that institution in order to achieve the goals of the consent decree" (quoting *Navarro-Ayala v.*

*Hernandez-Colon,* 951 F.2d 1325, 1338 (1st Cir. 1991))); *see also Ruiz v. Lynaugh*, 811 F.2d 856, 861 (5th Cir. 1987) (discussing deference due district court in institutional reform cases "because it is intimately involved in the often complex process of institutional reformation" and "has the personal knowledge, experience, and insight necessary to evaluate the parties' intentions, performances, and capabilities").

**[5]** Moreover, it is BRU's burden to show otherwise. BRU must demonstrate that MTA failed to substantially comply with the decree in order to justify its extension. *Asarco*, 430 F.3d at 980 (stating that burden is on the moving party). In arguing that MTA's level of compliance was insubstantial, BRU focuses exclusively on just one of the decree's several requirements, and uses an imperfect and misleading metric to evaluate compliance. Further, BRU ignores the many ways in which MTA met or exceeded its obligations.

Although the underlying data measuring bus overcrowding are not in dispute, the parties interpret that data in vastly different ways. BRU argues that the data demonstrate compliance rates as low as 9% with the 1.20 load factor target during 2005 and 2006. Meanwhile, MTA argues the same data supports the conclusion that it achieved a 94-99% compliance rate with the load factors during the same time period. In some sense, both figures are correct.

**[6]** BRU's compliance figures are based on the standard set forth in the decree for identifying instances of violations of the load factor targets. According to the decree, peak load factors are to be determined "by computing the highest ratio of total number of passengers to total number of seats achieved during any 20 minute weekday peak period in the peak direction of travel on each bus line." Under this metric, if a bus line exceeds the load factor just once during a given quarter, that line is deemed noncompliant for the entire quarter, even if that line met the target at every other measurement that quarter. MTA argues that this standard greatly overstates its

level of noncompliance, and it offers its own figures to compensate for this limitation. MTA states that in 2005, it monitored 123,154 20-minute time periods and found that 96.89% of those periods experienced no load factors above the 1.20 target.

**[7]** BRU correctly notes that the figures it cites are based on the compliance standard written into the decree and affirmed by this court in *Labor/Community*. 263 F.3d at 1048-49. But that standard measures only strict compliance with the load factor targets — not compliance with the decree overall — and does so in an imprecise manner. That coarse-grained metric is useful for certain types of analyses, such as determining whether there has been full and absolute compliance (MTA concedes there has not been), but it is not particularly helpful in measuring levels of compliance below 100%, and it fails to accurately capture the extent to which MTA did meet the targets during the relevant time periods.

**[8]** If the question here were simply whether MTA had achieved full compliance with the decree, we would use BRU's proposed standard. But the question is whether there was substantial compliance, a less precise standard that cannot be satisfied by reference to one particular figure, while ignoring alternative information. Our analysis requires we do more than simply count the number of technical deviations from the decree. Instead, we must determine, using a holistic view of all the available information, whether MTA's compliance with the Decree overall was substantial, notwithstanding some minimal level of noncompliance.

**[9]** In addition to using an imperfect metric to evaluate compliance with the load factor targets, BRU also focuses narrowly on that one requirement, as does the dissent, at the expense of giving due weight to the various other requirements under the decree which MTA met, and in some cases, exceeded. There is no question that the reduction of bus overcrowding was an important part of the decree. But so were

other requirements. As BRU's counsel described, the decree imposes three "essential" and "core" requirements on MTA. These are the reduction in bus overcrowding through the load factor targets, new service through an expedited pilot project followed by a five-year new service plan, and a roll-back and lowering of bus fares for at least five years. MTA exceeded its obligations as to the bus fare and pass requirements, maintaining fares at specified levels for years longer than it was required to do so. And MTA has now met its obligations relating to new service requirements. To give some idea of the extent of MTA's efforts, since the start of the decree, it has added 1.2 million in-service hours annually, and added over 545 buses to its peak fleet in order to expand its bus service. BRU argues that MTA's achievements in these areas are outweighed by its imperfect compliance with the load factor targets. Of course, there is no precise formula describing how best to weigh the various obligations under the decree, and there is no indication that the district court abused its discretion in weighing them as it did.

We note that the de minimis level of noncompliance here is nowhere close to the near total noncompliance in cases in which courts concluded that extensions of the consent decrees were warranted. In *Thompson*, 404 F.3d at 834, there was a "near total failure" of some defendants to comply with their obligations. Those defendants failed to do "almost [anything] that they were required to do under the Decree[.]" *Id.* at 828; *see also David C.*, 242 F.3d at 1212-13 (noting that defendant was "20 percent in compliance and 80 percent in noncompliance"). In contrast, aside from the imperfect compliance with the load factor targets, MTA complied fully with its numerous obligations under the decree.

**[10]** We hold that BRU has failed to demonstrate that the district court abused its discretion in finding that MTA had substantially complied with the consent decree. The evidence presented supported the district court's finding that the imperfections with respect to load factor targets were de minimis in

relation to the overall scheme of things. Because the first prong of the *Rufo* test fails, we hold that the district court did not abuse its discretion in refusing to extend the decree.

**[11]** Our decision is consistent with the principle that federal court intervention in state institutions is a temporary measure and may extend no longer than necessary to cure constitutional violations. *See Bd. of Ed. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991); *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986). In this case, as the district court found, perhaps every last wish and hope of the decree was not achieved, but the decree accomplished its essential purposes and the situation improved greatly. These improvements strongly inform our assessment that the district court was within its discretion in holding that it no longer needed to oversee the running of the Los Angeles County bus system.

## B.   BRU's Motion for Contempt Sanctions

BRU also contends that the district court abused its discretion in denying its motion for civil contempt sanctions against MTA for MTA's alleged failure to comply with the 2004 Final Order. For issuance of a contempt order against MTA to be proper, BRU must establish "(1) that [MTA] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). BRU argues that MTA violated the Final Order in two ways: (1) by failing to allocate all of the newly purchased buses and additional service hours to peak time periods, and (2) by failing to hire any new mechanics.

The Final Order required that, among other things, MTA purchase "the vehicular equivalent of 145 new 40-seat expansion buses" and add an additional 290,145 annual in-service hours. MTA did add 145 buses and 298,985 in-service hours

to the bus system. But according to BRU, MTA violated the Final Order by failing to allocate all of these resources to peak time periods. MTA does not dispute that some of the new hours and buses went to non-peak times, but contends that the Final Order gave MTA discretion regarding how to perform the allocation.

[12] Upon review of the Final Order, it is not immediately obvious whether the hours and buses were required to be allocated to peak time periods. There is no express language directing MTA to do so and the Final Order provides MTA with "discretion" to deploy the buses "throughout the bus system." Even assuming that MTA violated the Final Order by allocating some resources to non-peak time periods, the district court was within its discretion in ruling that contempt sanctions were not warranted. There is no evidence that MTA's conduct was "not based on a good faith and reasonable interpretation of the order." *See id.*

[13] While MTA did not add all of the additional in-service hours to peak periods, it did add an estimated 162,947 annual in-service hours during peak periods and did increase its total annual in-service hours by more than the amount required by the Final Order. MTA also added 145 buses to its fleet as required (though it is not clear how many of those buses were added to peak time periods). These efforts rebut any inference that MTA was acting in bad faith. In addition, even if MTA's interpretation of the Final Order were ultimately deemed incorrect, it was not unreasonable. MTA is right that the Final Order does not literally state that the additional hours and buses must be added during peak times.

[14] BRU also argues that MTA's failure to hire new mechanics violated the Final Order, which mandated that MTA "[h]ire additional mechanics as needed to meet the expansion service requirements[.]" The language "as needed" renders the directive conditional, and we have no basis to second-guess MTA's conclusion that it had no need to hire

more mechanics. It is, for example, undisputed that MTA added nearly 300,000 annual in-service hours after Special Master Bliss issued the Final Order. The fact that MTA increased its in-service hours so significantly without adding mechanics lends substantial credence to its argument that no new mechanics were needed to meet its obligations under the Final Order.

**[15]** We hold that BRU has not demonstrated that the district court abused its discretion in declining to sanction MTA for its alleged violations of the Final Order.

## IV.   Conclusion

For the foregoing reasons, the District Court's denial of Plaintiffs' Motion to Extend and its denial of Plaintiffs' Motion for Civil Contempt Sanctions are AFFIRMED.

---

BERZON, Circuit Judge, dissenting:

I respectfully dissent.

The defendants simply did not comply, substantially or otherwise, with the Consent Decree's requirements for relieving the overcrowding on buses. The Consent Decree and the associated orders from the Special Master spell out in detail the method by which the parties agreed to measure bus overcrowding and define performance targets that MTA is required to meet. Critically, the Decree also expressly prohibits MTA from seeking to modify the Decree for changed circumstances because of the difficulty meeting targets as set out in the Decree. *See* Consent Decree § II.A.4 ("The failure of MTA to meet target load factors shall not be deemed a changed or unforeseen factual condition for purposes of seeking a modification of this Consent Decree by MTA").

Yet, it is just such a modification that MTA has in effect granted to itself, and that the majority is willing to countenance. Unable to comply with the load factor targets defined in the Decree, MTA devised its own measure of compliance and then announced that it had met that measure. The district court went along, without explaining why the defendants were entitled to rewrite a provision to which they had consented and which they had contractually agreed not to try to modify.

Under these circumstances, I am quite certain, it was an abuse of discretion for the district court to terminate its jurisdiction to enforce the Decree. To rule otherwise is to sanction a governmental agency's flaunting of the law and breaking of solemn promises. I can agree to neither.

## 1.   The Consent Decree

The majority's account of the background of this case is accurate but incomplete.

First, the Decree identified the reduction of overcrowding on County buses as one of its "critical objective[s]." The means for accomplishing this objective, and, more importantly, the interpretation and enforceability of provisions in the Decree designed to achieve this goal have long been a subject of dispute between the parties. *See, e.g.*, *Labor/ Community Strategy Ctr. v. L.A. County Metro. Trans. Auth.*, 263 F.3d 1041, 1043 (9th Cir. 2001) ("*Labor/Community*"). In this appeal, BRU once again contests MTA's compliance with Section II.A of the Decree, which committed MTA to "[r]educing [o]vercrowding [b]y [a]dding [n]ew [s]ervice."

As the majority recites, to measure compliance with this requirement, the Decree set forth specific "load factor targets," with specified compliance dates for each target, and provided MTA with "discretion in determining how the targets w[ould] be met." *See* Maj. Op. at 5211-12 for an explanation of the "load factor" concept. As the majority also

explains, the Decree included procedural mechanisms to monitor implementation and enforcement. *See* Maj. Op. at 5212.

It is notable — but not noted by the majority, except in passing, *see* Maj. Op. at 5213-14 — that this is the second time, not the first, that MTA has come to this court to complain that the load factor target terms of the Decree are too harsh. In *Labor/Community*, MTA argued that the district court had erred in interpreting the load factor target requirements of the Decree. *See* 263 F.3d at 1048. The targets, MTA asserted, "were simply performance goals that MTA promised to use its 'best efforts' to meet, but with which the [D]ecree only required 'substantial compliance.' " *Id.* at 1048. We disagreed, holding that MTA's interpretation of what the Decree required "[was] refuted by a reading of the [D]ecree as a whole." *Id.* The Decree, we observed, "set out a mathematically precise method of measuring bus overcrowding and a detailed schedule of load factor targets that were to be met by specific dates." *Id.* at 1048-49. Therefore, "[t]o say that MTA's 'best efforts' are enough for compliance would be to ignore the precise load factor schedule set out in the decree." *Id.*

As I see this case, having failed to persuade us in *Labor/Community* that the load factor targets were only "performance goals" to be used to evaluate MTA's "best efforts," MTA went forward as if that is all they were. The district court went along with this subversion of the Decree, and now the majority does as well.

## 2.   The Special Master's Final Order

In 2003, two years after we issued the *Labor/Community* opinion, the question of MTA's failure to meet the load factor targets was once again before the Special Master. At that point, "[a]lthough the MTA ha[d] made significant service improvements," it was "undisputed that, during weekday peak

hours,[1] the MTA did not meet the [2000 load factor target of 1.25] on 72 non-exempt bus lines, and did not meet the [2002 load factor target of 1.2] on 75 non-exempt bus lines." Moreover, the BRU/MTA Working Group had concluded that meeting the peak hour load factor targets would "require the addition of 185 buses and 425,500 revenue service hours."

Once again, the parties could not agree on a specific remedial plan.[2] Therefore, after first issuing a proposed order to determine points of agreement and elicit modifications, the Special Master promulgated a "Final Order on Remedial Service Plan to Meet 1.25 and 1.2 Load Factor Target Requirements" (the "Final Order"). As the majority recounts, see Maj. Op. at 5214, the Final Order spelled out that "[i]n order to achieve compliance with the Consent Decree and to meet and maintain the 1.2 [load factor target]," MTA was required to provide the additional buses and service hours the Working Group had identified as necessary, and specified how it might do that. In addition, although the Final Order stated that the MTA would have discretion both in "how to deploy and schedule" the new buses and in allocating the additional in-service hours "on specific bus lines and during specific time periods throughout the bus system," the Order also made clear that "MTA should deploy this additional service to meet the objective of alleviating bus overcrowding to achieve the 1.2 [load factor target] on each and every bus line." The Final Order further stated that providing this expanded service, along with the other improvements specified, would constitute "substantial compliance with the load factor targets of the Consent Decree and create a presumption that [its] expansion

---

[1] Data for off-peak time periods was not available at the time.

[2] For example, although the Working Group had determined that MTA needed to add 185 buses to the relevant bus routes, MTA asserted that it could achieve the functional equivalent of adding 185 buses (or some portion thereof) by scheduling its existing fleet more efficiently. It therefore contended that it did not need physically to purchase 185 new buses. BRU contested these assertions.

bus procurement requirements . . . have been met." In other words, the Final Order *determined* what would constitute "substantial compliance." MTA's self-conferred abandonment of the load factor targets was *not* sanctioned by the Final Order.

### 3. The District Court's Opinion

After the district court declined to appoint a new Special Master, BRU filed motions to extend the duration of the Decree and for contempt sanctions; the district court denied both.[3] Critically, the paragraph the majority quotes on page 5218 from the district court's opinion is *all* the explanation the district court provided. *Why* the district court thought that "MTA has substantially complied" even though it entirely failed to comply according to the measure carefully included in the Decree, affirmed by this court, and elaborated upon in the Special Master's Final Order, we were not told.

As the majority holds, *see* Maj. Op. at 5217, lack of substantial compliance qualifies as a significant change in circumstances justifying modification of a consent decree by extending the length of judicial oversight. In my view, the district court's unexplained conclusion that there was substantial

---

[3]I note that BRU suggests that the Decree has no termination date and so extends beyond the ten year period. The Decree is in fact silent with respect to its overall termination date. *Compare Holland v. New Jersey Dept. of Corrections*, 246 F.3d 267, 279 (3rd Cir. 2001) (quoting the consent decree, which explicitly and separately defined both the duration of the district court's jurisdiction and the duration of the decree as a whole). It is therefore probable that the Decree is enforceable as a contract even if not as a judicial decree. *See, e.g., Board of Educ. of Oklahoma City v. Dowell*, 498 U.S. 236, 244-46 (1991) (holding that a desegregation decree extended beyond the district court's termination of its jurisdiction). Any such contractual enforcement issue is, however, beyond the scope of the current appeal.

compliance has no basis in the record, and was therefore clearly erroneous.[4]

Before turning to a discussion of MTA's compliance with the Decree since 2004, I note that the majority's reliance on the district court's "decade of knowledge about the case," and its characterization of the district court as "uniquely positioned to determine whether there had been substantial compliance," Maj. Op. at 5218, is grounded largely in fiction. Until his resignation in early 2006, Special Master Donald Bliss played the central role in monitoring MTA's compliance with its Decree obligations. For example, prior to issuing the 1999 Remedial Order that this Court upheld, Bliss conducted a painstaking bus line-by-bus line review of MTA's performance with respect to the 1.35 load factor target. The Order itself included an appendix which identified problems and proposed solutions for individual lines. The Special Master's 87-page 2004 Final Order likewise included detailed findings regarding MTA's compliance with the load factor targets and mandated highly specific remedies. In addition to these orders, Special Master Bliss issued literally dozens of detailed opinions and memoranda related to compliance issues. So, in fact, it was the Special Master, not the district court judge, who had been overseeing the Consent Decree on a day-to-day

---

[4]We have previously held in the context of a party's compliance with a federal regulation, that the "issue of substantial compliance is a mixed question of law and fact" that we review *de novo. See Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994). I nonetheless apply the more deferential clearly erroneous standard to our review of the district court's determination that MTA had substantially complied with the Decree for two reasons. First, BRU itself asks us to apply that standard. *See* Appellant's Opening Brief at 6 ("The factual findings themselves, such as the nature of the data and what the data meant, and the *resulting state of compliance with this Decree*, are addressed by a reviewing court under the clearly erroneous standard.") (emphasis added). Second, my review of the record indicates that the districts court's decision warrants reversal even under the more deferential standard. Whether we apply the clearly erroneous standard or a *de novo* standard is therefore irrelevant.

basis, who was intimately familiar with both its provisions and its on-the-ground application, and who had issued the key orders interpreting and implementing the Decree.

Moreover, with the resignation of the Special Master and Judge Hatter's refusal to appoint a new one (even though the parties had agreed on a replacement), specific findings of the type that permeated Special Master Bliss's orders were not available to the district court in deciding the motions that underlie this appeal and are not available to us now. Bliss himself does not appear to have updated his 2004 analysis of MTA's compliance with the load factor targets before his resignation in 2006. And, although it is possible that the district court performed a detailed review of MTA's compliance before issuing its order denying BRU's motion to extend, its terse opinion does not reveal that it did, suggest what that review entailed, or indicate what facts were found.[5]

At a minimum, the majority should have remanded for some elucidation of the district court's fact findings and legal reasoning before accepting its unexplained conclusions. But the majority does not do so.

### 4. MTA's Compliance with the Load Factor Requirements

Notwithstanding the limitations just discussed, the evidence that is available clearly reveals that MTA has not substantially complied with its commitments under the Decree. Specifically, MTA abysmally failed to meet the current load factor target, a "critical objective" of the Decree. Several facts demonstrate the broad extent of MTA's noncompliance.

---

[5]Because the parties did not timely appeal the district court's decision not to appoint a replacement special master, we cannot now reverse it. *See* 28 U.S.C. § 2107. Were the issue before us, I would hold that the failure to appoint the new special master agreed upon by the parties was, given the terms of the Consent Decree, an abuse of discretion.

First, as of the 2004 Final Report, MTA did not dispute that it had failed to meet the 1.20 load factor target in 2002 and 2003 on a significant number of its bus lines during peak hours, and that remedial measures were warranted. This conclusion, reached by the Joint Working Group, affirmed by the Special Master, and not appealed to the district court by MTA, rested on an analysis of line-by-line data collected by MTA.

Second, the updates to this data reveal that MTA remains substantially noncompliant. For example, data from 2005 and 2006 show that MTA failed to meet the 1.20 target on approximately 80 out of 90 monitored bus lines, a noncompliance rate of almost 90%. *See David C. v. Leavitt*, 242 F.3d 1206, 1212 (10th Cir. 2001) (concluding that an 80% noncompliance rate qualified as "substantial noncompliance" and merited modification of the decree); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1019 (6th Cir. 1994) (holding that noncompliance rates of between 25% and 40% were substantial enough to warrant modification under *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)).

Tellingly, MTA does not dispute this data or suggest that it was either collected or analyzed in a manner different from that employed by the Working Group and the Special Master in 2004. Rather, MTA suggests — and the majority agrees — that an entirely different approach can be used to analyze the data for purposes of determining substantial compliance with the Consent Decree, and that this new approach demonstrates that MTA is now in substantial compliance with the targets.

There are, however, several problems with the approach MTA espouses and the majority — blindly, with no inquiry at all into its premises — relies upon. First, MTA's methodology, even if accepted at face value, does not reveal an identifiable change in the rate of MTA's compliance with the load factor targets between 2002, a period for which MTA agreed that it was not substantially compliant, and now, when it

claims to have achieved substantial compliance. For instance, according to MTA's new methodology and its own calculations, the agency was in compliance with the 1.20 load factor target 96.38% of the time in the third quarter of 2005 and 95.99% of the time in the fourth quarter of 2005. MTA's own calculations using this same methodology indicate, however, that MTA was 96.14% compliant with the 1.20 load factor target in the third quarter of 2002, 95.28% compliant in the fourth quarter of that year, and 95.97% compliant in the third quarter of 2003. Indeed, a comparison of MTA's revised 2002 and 2003 calculations with its 2005 figures shows virtually no change in MTA's rate of compliance. Yet, as discussed above, MTA did not dispute in 2004 that it was not substantially compliant with the targets in 2002 and 2003. In other words, MTA's new methodology supports BRU's argument that MTA is no more compliant with the load factor targets now than it was when the Special Master issued the Final Order, finding that there had not yet been substantial compliance and setting out standards for judging substantial compliance in the future.[6]

In addition to failing to demonstrate any increase in its rate of compliance with the load factor targets, MTA's proposed methodology suffers from fundamental conceptual deficiencies. MTA readily acknowledges that its approach provides an aggregate measure of compliance with the 1.20 target, by averaging performance across bus lines. However, as Special Master Bliss repeatedly stated, "Section II of the Decree requires that the load factors be met on *each and every bus line*." Final Order at 46 n.39 (emphasis added). Thus, MTA's methodology does not provide adequate information for adducing its compliance with the Decree.

---

[6]In support of its argument that it need not achieve 100% compliance with the targets, MTA regularly cites statements by Special Master Bliss that "the Consent Decree does not require perfection." Whatever implications these statements may have, however, MTA has not demonstrated that it is any closer to achieving "perfection" or near "perfection" than it was in 2004.

The Authority's approach also averages peak and non-peak hour data. Once again, such averaging runs counter to the express language of the Decree, which specifically requires that the agency meet the load factor targets during both peak hours and non-peak hours. In other words, MTA cannot demonstrate substantial compliance by averaging low compliance rates in peak hours with high compliance rates in non-peak hours. It must achieve high compliance rates on each relevant bus line during *both* peak and non-peak periods to substantially comply with Decree, as that — not just some *average* improvement — is what the Decree required.

Despite these significant problems with its approach, MTA contends that its method is superior to BRU's because, according to MTA, BRU's methodology "misleading[ly]" identifies a bus line as noncompliant for a given quarter if that line exceeds the target even once in that quarter. MTA's argument is unpersuasive for two reasons. First, the Special Master agreed with BRU that a single measured exceedence renders a bus line noncompliant. *See* Final Order at 7 (For example, *57* monitored bus lines exhibited *one* or more exceedences *above 1.35 LFT* [in 2003Q3] . . . Moreover, *40* monitored bus lines exhibited *one* or more exceedences *above 1.5 [load factor target.]*") (emphasis added). Second, MTA's own methodology suggests that each line exceeds the load factor target more than once per quarter. For example, in the first quarter of 2005, MTA's data show there were 271 measured exceedences across 65 monitored bus lines. This number of exceedences equates to just over 4 measured exceedences per line per quarter. The number of exceedences on these 65 lines jumps to 532, or more than 8 per line per quarter, by the fourth quarter of that same year. In short, even if MTA is correct in characterizing BRU's methodology as "misleading" — a characterization the majority echoes, even though the methodology is the one employed by Special Master Bliss — its *own* data and methodology suggest that it frequently exceeds the load factor targets.

The majority does not recognize any of these deficiencies in MTA's statistical showing, maintaining that the parties simply "interpret [the] data" in different ways, and that "both [parties'] figures are correct." Maj. Op. at p. 5219. That simply cannot be.

The load factor targets, measured as BRU measures them, are *in* the Decree; they are not simply external measures of compliance with more general goals contained in the Decree. So, in effect, far from "using a holistic view of all available the information," Maj. Op. at 5220, to judge compliance with the Decree, the majority would sanction an implicit, unilateral, substantive modification of the consent decree at the behest of the defendants, changing the method agreed upon by the parties for determining how the overcrowding problem would be solved. Moreover, the Decree, as interpreted by the Special Master with the approval of this court, prescribed the manner in which the targets are to be understood and applied. To call that prescribed methodology an "imperfect and misleading metric," Maj. Op. at 5219, and then ignore it is to rewrite the Decree. It is that metric, imperfect or otherwise, the parties chose and the district court adopted, not some other.

Using the Decree's methodology, the defendants were not in substantial compliance. Only by altering the decree's agreed-upon methodology can one come to an opposite conclusion. Put another way, although the methodology defendants suggest and the majority would sanction *could* have been the agreed-upon way of curing the overcrowding problem, it was not. That is why it is only by substantively modifying the consent decree that the defendants could have reached the result they support and that the majority approves.

But the defendants did not move for such a modification. The reason, in all likelihood, is that they were precluded by the decree itself from doing so.

Section II.A.4 of the decree provides that "The failure of MTA to meet the target load factors shall not be deemed a changed or unforeseen factual condition for purposes of seeking a modification of the Consent Decree by MTA." That the parties included this unusual provision in the consent decree indicates how important the precisely delineated target load factors provided for in the decree were to the bargain struck.

In the end, MTA did fail to meet the target load factors the parties had agreed upon, not just here and there but *substantially*. In other words, MTA *did not* substantially comply with the terms of the Decree. Period. Instead, MTA sought to prove substantial compliance by formulating a different measure of load improvement than the parties' bargain required. Allowing that alteration would be tantamount to a substantive modification of the decree in the defendant's favor.

But no modification has been requested, and no basis for one has been suggested other than the contractually forbidden consideration — that MTA did not meet the target load factors provided for in the consent decree. To backdoor the consent decree's prohibition on modification by unilaterally failing to comply throughout the period of the decree and then claiming substantial compliance through a different measure than the parties agreed upon simply flaunts the rule of law. That the majority approves this lawless stratagem by a public body can only encourage others to engage in similarly bald evasion of judicial decrees arrived at after lengthy negotiation and approved by the courts. It is grave concern about sanctioning such evasion that motivates this dissent, even more so than the quite serious indignities many people in Los Angeles suffer when using the City's transportation system and that the Decree was supposed to alleviate.

In an alternative argument not addressed by the majority, MTA asserts that, regardless of what the data about actual overcrowding shows, it substantially complied with the load factor targets of the Decree by implementing the capacity

expansion requirements imposed on it by Special Master Bliss in the Final Order. These requirements included the purchase of 145 40-seat buses and the addition of 290,145 annual in-service hours.

Special Master Bliss did indicate that MTA's implementation of the requirements just discussed would "constitute good faith, substantial compliance with the load factor targets of the Consent Decree" and would "create a presumption that the . . . requirements of Section II.A of the Decree have been met." And BRU does not dispute that MTA added almost 300,000 annual in-service hours since the 2004 Final Order.

The problem with MTA's position, however, is that it added 45% of these in-service hours during non-peak time periods. MTA asserts that this allocation is consistent with the Final Order because the Order did not specifically state that the additional hours had to be added at peak times. MTA maintains that the Decree provided MTA with discretion concerning when to add the hours, and that the non-peak hour additions therefore give rise to the compliance presumption alluded to in the Order.

This interpretation of the Final Order is wrong.[7] Although the Final Order inartfully states that "the MTA has discretion in scheduling [the additional buses and in-service hours] on specific bus lines and during specific time periods throughout the bus system," the Special Master undeniably intended

_____

[7]I note that the district court has never provided its own interpretation of the Final Order's requirements. In 2004, it affirmed the Final Order in its entirety in a single sentence. In the 2006 order which gives rise to this appeal, the district court stated only that "MTA has substantially complied, and taken all reasonable steps within its power to insure compliance, with the Final Order." Although we typically review a district court's interpretation of a consent decree *de novo* with "deference . . . based on the court's extensive oversight of the decree," the district court has not provided a pertinent interpretation of the Final Order to which we might defer.

MTA to add the additional buses and in-service hours to peak time periods. The clearest indication of this intent is provided in the section of the Final Order entitled, "What level of expansion service should be added to alleviate bus over-crowding during off-peak hours?" In the section, Special Master Bliss states that "the Consent Decree *also* requires that the load factor targets be met during off-peaks hours." (emphasis added). Notwithstanding this requirement, the Special Master deferred a decision on MTA's compliance with off-peak targets on the grounds that the relevant data were not yet available. The Special Master then instructed that, once the data was collected,

> The JWG thereafter should apply the remedial methodology and determine the number of off-peak [expansion service units] to be implemented by the MTA in the June 2004 service change. Since peak fleet requirements are greater than off-peak requirements, this should not necessitate the procurement of any additional expansion buses, *but it will require an appropriate increase of bus in-service hours during the relevant off-peak periods.*

Final Order at 59 (emphasis added). In other words, the Special Master indicated that, at the time of the Final Order, he was not yet certain how many additional in-service hours were required during off-peak periods (although he did believe that some increase would be necessary). By implication, his exceedingly specific 290,145 additional in-service hour requirement must have applied only to peak hours.

   This interpretation is further confirmed by the fact that Special Master Bliss derived the 145 bus and 290,145 hour requirements from the Working Group's conclusion that MTA needed to add "331 expansion service units [to] the weekday A.M. peak hours . . . and 453 expansion service units [to] the weekday P.M. peak hours." In other words, the requirements were tied directly to the Working Group's deter-

mination that MTA needed to expand service during peak times; the Working Group made no such determination regarding non-peak periods.

In short, although the Special Master provided MTA with the discretion to add the 290,000 in-service hours wherever it chose "throughout the bus system," and whenever it chose during peak time periods, MTA was nonetheless required to add those hours to peak time periods. MTA's contention to the contrary is untenable.

I conclude that an analysis of the record leads to only one reasonable conclusion: MTA remains substantially noncompliant with the load factor targets.

### 5. MTA's Compliance with the Other Decree Requirements

MTA suggests, and the majority in passing agrees, that, even if MTA did not substantially comply with the load factor requirements, it nonetheless substantially complied with the Decree as a whole, because it satisfied other obligations imposed on it by the Decree. As examples of its success in meeting the Decree's other requirements, MTA cites its introduction of a Regional EZ Transit Pass and a Day Pass and implementation of the Metro Rapid bus network as a form of new service.

I am not persuaded. The Decree describes the reduction of bus overcrowding through compliance with the load factor targets as a "critical objective." Moreover, the Decree establishes a "mathematically precise," *Labor/Community*, 263 F.3d at 1046, system of targets and deadlines for achieving this objective, and devotes more text to the load factor requirements than to most of the other requirements combined. Only those provisions related to bus fares rival the load factor requirements in apparent importance.

The import of the load factor requirements is further underscored by the substantial amount of time the Special Master and the Working Group devoted to monitoring MTA's compliance with those requirements and to crafting remedial measures to cure MTA's noncompliance. The voluminous pre-2004 administrative record belies any suggestion that compliance with the load factor targets was not of predominant significance.[8]

In sum, because the load factor targets are such a central component of the Decree, I cannot accept the majority's suggestion that compliance with other provisions could outweigh MTA's lack of substantial compliance with the targets.

I would hold, therefore, that MTA did not substantially comply with the Decree's load factor requirements, and that this failure qualifies as a significant change in factual circumstances sufficient to justify extension of the district court's enforcement authority. Under the terms of the Decree, MTA promised that it would meet the third and final target by June 30, 2002, four full years before the district court's retention of jurisdiction ended. As explained above, MTA remains substantially noncompliant with the Decree's load factor requirements, and therefore failed to adhere to its promise and the parties' expectations. Extending the Decree to ensure that the planned compliance occurs is a natural response to MTA's failure.

---

[8]It is also noteworthy that the Special Master downplayed the significance of alleged improvements such as the Metro Rapid Service and the Limited Stop Service. *See* Final Report at 30, 31 (noting that "bus overcrowding conditions worsened on Line 111 (Florence Avene) after the inauguration of Rapid Bus service" and that "[o]vercrowding similarly persists on Lines 60 (Long Beach Blvd.) and 66 (E. Olympic Blvd.) even after the introduction of Limited Stop Service").

### 6.    Conclusion

In short, I would hold that the district court erroneously concluded that MTA had substantially complied with its obligations under the Decree, and so abused its discretion when it denied BRU's motion to extend its jurisdiction to enforce the Decree. *See Kenney*, 458 F.3d at 1032. Although I agree with the majority that a consent decree should extend no longer than necessary, *See* Maj. Op. at 5220-21, MTA's ongoing failure to comply with a "critical objective" of the Decree necessitates extension in this case. *See Board of Educ. of Oklahoma City*, 498 U.S. at 249-50 (holding that, when deciding whether to dissolve a decree, the district court "should address itself to whether the [defendant] had complied with the [consent] decree since it was entered"). I therefore respectfully dissent.[9]

---

[9]I concur in the majority's holding that the district court did not abuse its discretion in concluding that contempt sanctions are not warranted.